## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JOHN DOE EAL1**,

      Plaintiff,

   v.

**THE UNIVERSITY OF MICHIGAN** and **THE REGENTS OF THE UNIVERSITY OF MICHIGAN** (official capacity only),

      Jointly and Severally;

Defendants.

_____

Case No. 2:22-cv
Hon.

**COMPLAINT / JURY DEMAND**
*Related Case Notice*

This case presents the same issues, claims, and defendant as that in John Doe MC-1 v. University of Michigan *et al*., Case No. 2:20-cv-10568, before Hon. Victoria A. Roberts

Elizabeth K. Abdnour (P78203)
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Suite 4A-2
Lansing, MI 48915
(517) 292-0067 phone
(517) 709-7700 fax
elizabeth@abdnour.com

Karen Truszkowski (P56929)
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
844-534-2560 phone
800-531-6527 fax
karen@temperancelegalgroup.com

*Attorneys for Plaintiffs*

_____

## **COMPLAINT**

Plaintiff JOHN DOE EAL1, by and through his attorneys, ELIZABETH ABDNOUR and KAREN TRUSZKOWSKI, hereby file the following complaint against Defendants as captioned above.

### **I.  INTRODUCTION**

1. The University of Michigan (UM) employed Dr. Robert Anderson (Anderson) as a physician from 1966 until 2003.

2. While employed at UM and while acting in his capacity as an employee/agent/representative/fiduciary of UM, Anderson sexually assaulted, battered, molested, and harassed students, especially male student athletes, including Plaintiff, under the guise of medical treatment.

3. Anderson used his position of trust and authority to abuse students, non-students, and student athletes over the course of his nearly four-decade career with UM.

4. Based on information and belief, as early as 1968, UM became aware of Anderson's above-mentioned actions after receiving complaints that Anderson committed sexual assaults during medical examinations.

5. After receiving additional complaints that Anderson was sexually assaulting students, in 1979 UM moved Anderson from his position within University Health Services (UHS).

2

6. On information and belief, instead of terminating/disciplining/investigating Anderson and or reporting his behavior to the proper authorities, UM moved Anderson to the Athletic Department, where he continued to sexually assault students until his retirement in 2003.

7. After moving Anderson from UHS, UM also provided Anderson access to sexually assault students/non-students through the UM Health System in various positions including at the East Ann Arbor Health Care Facility and to provide clinical instruction at the UM Medical School.

8. Anderson's abuse was so prevalent and open that he even earned the nickname "Dr. Drop Your Drawers" among student athletes.

9. UM concealed Anderson's past, present, and future sexual abuse of vulnerable students and student athletes from the public for the benefit of UM and to the detriment of its student body and the community at large.

10. UM's placement of Anderson into the Athletic Department gave him access to a continuous supply of vulnerable students, including Plaintiff.

11. Student athletes were encouraged to see Anderson for physicals and other medical treatments related to their collegiate athletic careers/eligibility and overall physical health.

12. Plaintiff relied on UM and its representations as a provider of world class medical care ("the Michigan Difference") when they sought treatment from Dr. Anderson, an employee/agent/representative/fiduciary of UM.

13. UM had direct knowledge of Dr. Anderson's sexual assaults and turned a blind eye to them resulting in direct harm to Plaintiff.

14. UM is responsible for the Plaintiff' damages resulting from Dr. Anderson's sexual assaults, abuse, harassment, battery, molestation, and nonconsensual touching.

15. This is a civil action against UM and Regents for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff because of Defendants acts and omissions in their official capacity and their respective employees, representatives, and agents relating to sexual assault, abuse, harassment, battery, molestation, and nonconsensual touching against Plaintiff.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising from the Constitution, laws, and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

4

17. This Court has original subject matter jurisdiction under 28 U.S.C. § 1343 as this is a civil action authorized by law brought by a person to redress the deprivation, under color of a State Law, statute, ordinance, regulation, custom or usage, of a right, privilege or immunity secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and a civil action to recover damages or to secure equitable relief under an Act of Congress providing for the protection of civil rights.

18. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

19. The claims are cognizable under the United States Constitution, U.S.C. § 1983, 20 U.S.C. § 1681 *et seq.*, and under Michigan Law.

20. The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

21. The events giving rise to this lawsuit occurred in Washtenaw County, in the State of Michigan, which is in the Southern Division of the Eastern District of Michigan.

22. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court for the Eastern District of Michigan, as this is the district in which the events giving rise to the claims in this Complaint occurred.

23. Plaintiff's Complaint is timely filed within the applicable statutes of limitations and under M.C.L. § 600.6431(3).

### III.  PARTIES

24. Plaintiff John Doe EAL1[1] is a resident of the State of Vermont.

25. Defendant University of Michigan (UM) is a public university organized and existing under the laws of the State of Michigan.

26. UM receives federal financial assistance and therefore is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

27. Defendant Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

28. Regents are responsible for governing the University of Michigan including, but not limited to the UM Health System (UHS) and the Athletic Department.

29. Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., sovereign immunity, or any other statute or Michigan or United States constitutional provision.

---

[1] John Doe EAL1 is a pseudonym.

## IV.   COMMON FACTUAL ALLEGATIONS

30. Plaintiff realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

31. From 1966-2003 Anderson was employed as a physician treating students, nonstudents, and student athletes on UM's campus.

32. UM provided Anderson with a pool of vulnerable young men for Anderson to treat with impunity through UM's health system and Athletic Department.

33. On information and belief, UM hired Anderson in September of 1966 where he held a position within UHS giving medical care to student athletes, students, and nonstudents.

34. It was sometime soon after beginning employment with UM that, according to Ambassador Ron Weiser, current chair of the UM Board of Regents, Anderson abused Ambassador Weiser while Weiser was a freshman wrestler at UM.

35. On or about October 1, 1968, UM promoted Anderson to UHS Director, and Anderson continued as the Athletic Department's primary care physician and team physician for UM's athletic teams.

36. In 1968 or 1969, a UM undergraduate student (hereinafter Student 1), went for an examination with Anderson, that he later described to *The Detroit News* as "very traumatic" and during which he stated that, "he (Anderson) had me

drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals.

37. Student 1 further stated that "[b]ack then you did not question a doctor's authority … he asked me to pull on his penis."

38. Student 1 filed a written complaint with UHS, detailing that Anderson had dropped his pants and asked Student 1 to fondle his genitals.

39. Despite this significant red flag, no one from UM followed up with Student 1 and no one investigated the complaint against Anderson.

40. On information and belief, UM never investigated or took any action regarding Student 1's complaint.

41. In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The student reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs.

42. On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer.

43. However, UM failed to act and continued to employ Anderson until he voluntarily retired in 2003.

44. In 1975, Bill Johannesen, who was then UM's wrestling coach, admitted that when one of his wrestlers went to Anderson they had to "drop their drawers" even if the injury was to the wrestler's elbow.

45. A scholarship athlete on UM's wrestling team in 1975 (Student 2), gave notice of Anderson's sexual misconduct in a 10-page letter to Coach Johannesen, complaining that "Something was wrong with Anderson, regardless of what you are there for, he insists that you 'drop your drawers' and cough."

46. Neither UM, nor Coach Johannesen, nor any agents of UM investigated Student 2's complaints about Anderson's sexual assaults and instead Coach Johannesen revoked Student 2's athletic scholarship.

47. Student 2 appealed to Don Canham, the Athletic Director at the time, giving the Athletic Director notice of the allegations against Anderson, but Canham refused to take action/investigate the complaints against Anderson and upheld the wrestling coach's decision to pull Student 2's athletic scholarship.

48. Student 2 hired an attorney and appealed to UM's Board of Intercollegiate Athletics to get his scholarship returned.

49. On information and belief, the above-mentioned Board, found Student 2 to be credible and yet UM still did nothing to prevent Anderson's sexual abuse.

50. Another male student (Student 3), who attended UM in the 1970s, filed a complaint in this Court (Case No. 2:20-cv-10622), alleging that Anderson

repeatedly groped this student's penis and testicles, and digitally penetrated his anus during approximately 25 visits to Anderson for a variety of illnesses and injuries.

51. In 1976, Student 3 approached the track coach as well as the assistant track coach and informed them about Anderson groping him during medical exams (he was too embarrassed to speak out about the digital penetration at the time).

52. Student 3 requested that he be allowed to see another physician, but were laughed off by the track coaches, who refused his request.

53. This indifference to Anderson's actions by coaches and individuals in positions of authority at the University of Michigan normalized Anderson's behavior.

54. The track team had started calling Anderson "the pants down doctor" around this time.

55. According to records from the Washtenaw County Prosecutor's Office, in 1979, a then-graduate student at UM (Student 4) was seen by Anderson at UHS and reported that Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable . . . he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

56. Student 4 complained at UHS to the desk clerk and an administrator who both "dismissed" his complaints and had security escort Student 4 from the UHS premises.

57. Once again, with Student 4, UM had an opportunity to do the right thing and at the very least investigate Anderson's activities but failed to do so. In 1979, Anderson assaulted a Student Life employee/gay rights activist at the University by digitally penetrating him and after the employee reacted in pain Anderson stated, "I thought you would have enjoyed that!" The employee told his superior and then Vice President of Student Life at UM, Tom Easthope, that Anderson had assaulted multiple members of the gay community at the school.

58. Easthope did some investigating into the incident and later met with the employee where he told him that he spoke with Dr. Anderson and that "He (Anderson) does not deny your allegations against him," Easthope also stated that, "Dr. Anderson is troubled, sick, and needing help...he's very sorry for any distress or upset he caused you."

59. Vice President Easthope, who had oversight of UHS, believed the employee's account that Anderson was sexually assaulting patients and terminated Anderson despite his hesitation due to Anderson's status as a "big shot" at the University.

60. After terminating Anderson, Easthope allowed Anderson the privilege of resigning his position with UHS to avoid a dispute that could have prolonged Anderson's departure from UHS.

61. Unfortunately, according to UM human resource records, Anderson was not actually terminated, but "demoted" effective January 14, 1980, and UM continued to employ Anderson in positions where he had access to vulnerable patients.

62. Easthope was recently confronted about Anderson and claimed he was unaware that UM continued to employ Anderson as a physician after 1979 and stated that "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

63. Longtime UM athletic trainer Russell Miller, believes powerful Athletic Director Canham, a legend at UM, "worked out a deal" to allow Anderson to continue to work for UM in the Athletic Department, where he continued to sexually assault patients.

64. Despite his "termination" from UHS, UM allowed Anderson to treat patients within UHS until at least 1981, where he continued to molest and sexually assault students.

65. Anderson was considered a highly regarded physician at UM during his multi-decade career and was praised by Athletic Directors, trainers, and coaches.

One longtime coach of the UM football coaching staff during the 1980s, 1990s, and 2000s called Anderson "a tremendous asset."

66. In 1980, Anderson told the Ann Arbor News that Athletic Director Canham created a brand-new position for him as the "formal team physician."[2]

67. Despite being aware of Anderson's actions, UM fraudulently and egregiously concealed Anderson's behavior.

68. Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980 stated:

> The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine... his many contributions to health care are acknowledged.... The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him.

69. As noted above, UM continued to praise Anderson and his termination was changed to a "demotion" in his university human resources file, despite the numerous and increasing number of abhorrent complaints against him, so he could remain a physician within the University in some capacity.

---

[2] *See* THE ANN ARBOR NEWS, Jun. 10, 1999, at B7.

70. While under the protection UM's leadership, Anderson used his new position within the Athletic Department to abuse hundreds of UM male athletes, including Plaintiff.

71. After the demotion to the Athletic Department, UM continued to tout Anderson as a superstar physician, and he was praised by authority figures within the University including Athletic Director Canham.

72. Dr. Anderson was a powerful figure within the Athletic Department and the University as a whole. He not only eluded his "termination" in 1979, but Anderson travelled with the school's heralded football team on the road, was often seen prominently standing on the sidelines with the team during football games, and Anderson received VIP treatment for the football team's end of the year bowl games.

73. UM derives substantial revenue from its athletic programs, especially the historically successful football team, and a scandal involving its team doctor would have undoubtedly tarnished the school's reputation. Outside of his position within the Athletic Department, Anderson operated a private practice and worked as a physician at UM's East Ann Arbor Health Care facility where he also sexually assaulted patients. In 1993 UM acquired Anderson's private practice, another sign of the unprecedented support and influence Anderson had at the school.

74. Anderson remained with UM as a clinical instructor at the UM Internal Medicine Department until his retirement in 2003.

75. In summation: UM, at the very least, received complaints/warnings from students that Anderson was a sexual predator in 1968, 1975 and 1976 respectively. A graduate student then complained to UM about Anderson in 1979 and an activist/employee with Student Life informed UM that Anderson was sexually abusing gay students in 1979. UM acknowledged Anderson was a sexual predator in 1979 and then "fired" Anderson, but instead of firing him, Anderson was simply moved to a position in the Athletic Department where he was given inconceivable access to scores of victims and where his actions and the allegations against him were actively hidden from the public.

76. Over the course of nearly 4 decades, complaints about Anderson's sexual abuse fell on deaf ears at UM and UM repeatedly failed to act to protect its students and the public at large from Anderson.

77. At all relevant times Anderson maintained an office in Ann Arbor, Michigan and held himself out as a representative/agent/employee and/or affiliate/etc. of UM.

78. At all relevant times, including from 1966-2003, Anderson was acting within the course and scope of his employment/agency with UM.

79. At all relevant times Athletic Director Don Canham, various coaches, and others were acting within the course and scope of their employment/agency with UM. Anderson in his capacity as a physician for UM, acted as a primary care physician for students, non-students, and student athletes including Plaintiff, who saw him for a litany of reasons ranging from cold and flu issues to broken bones.

80. UM took no action to investigate the above-mentioned complaints from students and provided Anderson access to sexually assault patients with impunity. UM failed to take corrective action against Anderson even after Easthope tried firing him in 1979, causing severe trauma and damages to victims of Anderson for decades because of his sexual abuse during "medical examinations."

81. Young students who saw Anderson were needlessly exposed to a sexual predator who would sexually assault, molest, and abuse patients via nonconsensual sexual touching and nonconsensual digital anal penetration. Young men abused by Anderson were led to believe by those with authority, including many in UM's administration and Anderson himself that the medical "treatments" they received were necessary, when they were performed by Anderson to satisfy his sexual desires.

82. Despite how uncomfortable the young victims were with Anderson; they did not appreciate the extent of the abuse at the time as it was normalized and downplayed by many within UM's community.  Many student athlete victims faced immense pressure to perform, which included healing quickly from injury so they could return to their field of play as quickly as possible, which usually meant seeing Anderson, the Athletic Department's "superstar."

83. UM failed to act to protect its student body and the community at large despite having knowledge of Anderson's sexual abuse during medical examinations.

84. Because of UM's failure to act, even with knowledge of Anderson's abuse, Plaintiff was sexually assaulted, abused, battered, and molested by Anderson.

85. As early as 1968, UM had notice of Anderson's sexual abuse, and Plaintiff's assaults could have/would have been prevented had UM acted on and/or investigated any of the numerous complaints against Anderson.

86. Plaintiff's assaults could have and would have also been prevented if Defendants fired Anderson in 1979 instead of moving him to the Athletic Department and had UM provided information to Plaintiff or their parents regarding the numerous allegations against Anderson, wherefore Plaintiff would have likely seen a different physician.

87. UM facilitated Anderson's abuse of Plaintiff by failing to act and failing to warn them about allegations of Anderson's sexual abuse and failing to

supervise Anderson even after UM received credible complaints of his sexual abuse.

88. Anderson abused Plaintiff at his office(s) within UM and under the guise of medical treatment.

89. More recently, with allegations and complaints about Anderson coming to light, UM continued to repeat its pattern of mishandling these allegations as it stalled its disclosure of these incidents to the public and its former students for 19 long months.

90. On July 18, 2018, Student 2 sent a letter to current Athletic Director Warde Manuel, notifying him of Anderson's sexual assaults against him when he was a student from 1972-76, he notified former Athletic Director Don Canham of the same in the 1970's.

91. On information and belief, UM requested its campus police department to begin a non-public investigation in response to Student 2's letter to Athletic Director Manuel, but it took no further action to address/notify former students and/or the public about the allegations, Anderson's lengthy history of sexual abuse of UM's students, and/or its investigation until compelled to do so by *The Detroit News* 19 months later.

92. Former UM President Schlissel admitted on February 20, 2020, "Our (UM) police found indications that UM staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."[3]

93. At least one of UM's Board of Regents, Regent Ron Weiser, had personal knowledge that Student 2's allegations of sexual assault in the July 2018 letter were true.

94. Another member of the UM Board of Regents, Regent Paul Brown, recently stated publicly that Anderson also sexually assaulted three members of his family when they were students at UM.

95. For several years, Defendants have been under intense media, public, legal, and governmental scrutiny regarding their mishandling of sexual harassment and sexual assaults committed by faculty members, including, but not limited to Professor David Daniels; several Title IX complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

---

[3] *See* Darcie Moran, *Michigan staff knew of sexual misconduct allegations against doctor, president says*, THE DETROIT NEWS (Feb. 20, 2020), https://www.freep.com/story/news/local/michigan/2020/02/20/university-of-michigan-sexual-misconduct-allegations-robert-anderson/4823878002/.

96. Defendants' 19-month delay in notifying the public and alumni about Anderson's abuse of students is consistent with the pattern of UM's recent reactions to sexual abuse allegations mentioned above.

97. Plaintiff was sexually abused, assaulted, harassed, and molested during medical examinations by Anderson in a number of ways including, but not limited to: anal penetration, groping and manipulation of their genitals without consent, unwanted and non-consensual touching of genitals for prolonged periods of time, inappropriate sexual remarks, lewd sexual comments including comments about endowment and sexual performance, inappropriate cupping of testicles, unwanted sexual touching, digital penetration, attempted digital penetration.

98. Each of the above-mentioned actions were not done for a medical purpose but for Anderson's own sexual pleasure.

99. Plaintiff relied on UM and its agents/employees/administrators etc., who pushed and encouraged them to treat with Anderson through UHS and the UM Health System and Athletic Department.

100.    Plaintiff chose to attend UM for their academic/athletic careers in part due to its national reputations as "the leaders and the best," as stated in the school's fight song and echoed by alumni and fans of the University.

101.    UM offered Plaintiff affordable and or free healthcare through their paid tuition and scholarships, which made Anderson's services cost effective and readily available.

102.    Plaintiff trusted UM and their agents, representatives, administrators, and employees who encouraged them to seek healthcare and treatment through UHS and the UM Health System and touted Anderson as an exceptional doctor.

103.    Plaintiff never saw Anderson for injuries to their genitals or anus and at no point complained about issues with those body parts.

104.    Plaintiff was ignorant to the fact that Anderson's treatments were for his own criminal sexual intentions and that UM knew of Anderson's behavior and actions and intentionally and wantonly gave a sexual predator access to abuse Plaintiff and other male patients.

105.    Anderson's sexual abuse took place on UM property and on campus and Plaintiff trusted that the medical examinations they received through UM by Anderson were legitimate and necessary medical examinations for the purpose of treatment and diagnosis.

106.    Plaintiff also trusted Anderson as a medical professional and authority figure within UM.

107.     As a UM student, Plaintiff had no medical training or experience and was not aware that Anderson's treatment was sexual assault, abuse, and molestation. Plaintiff experienced shame, embarrassment, and discomfort in processing his assaults at the hands of Anderson under the guise of medical treatment and feared coming forward about his experiences until recently. Plaintiff developed an inherent distrust of doctors and medical professionals after Anderson's assaults.

## V.  PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS

108.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if restated herein.

109.     Plaintiff was a high-achieving athlete and student who had high SAT scores, was Vice President of the National Honor Society and was at the top of his high school class.

110.     Plaintiff played football in high school as an offensive guard, defensive lineman, and on special teams; and was an offensive guard at UM.

111.     Plaintiff received Pennsylvania All-star status and Scholar Athlete awards.

112.     Plaintiff was heavily recruited by most Division I football schools as well as Ivy League schools.

113.    Plaintiff was offered cash, dates with women, use of cars, free clothing, and athletic equipment on recruiting trips to multiple Division I football schools, all in violation of NCAA rules.

114.    It was implied that other perks would be available with signing a "letter of intent."

115.    Plaintiff applied to and was accepted into UM on a football scholarship.

116.    Plaintiff chose to attend UM because it was the only school to which he applied that did not offer perks that violated NCAA rules. Plaintiff was attracted to UM for its ethics and academics.

117.    Plaintiff started at UM in the fall of 1976.

118.    During his freshman year with the football program, Plaintiff met with Anderson a few times for various check-ups.

119.    During these early exams, Anderson always had Plaintiff pull his pants and underwear down to his knees. There would be a pause as Dr. Anderson visually inspected Plaintiff's genitals, and then there would be a prolonged manipulation of the testicles with Anderson's head turned away. Anderson would occasionally, but not always, request that Plaintiff cough as if it were a routine hernia examination.

120.    At the time, Plaintiff was alarmed and confused by the examinations.

121.     However, Plaintiff and his teammates were told that Anderson was "the best doctor" and "a member of the team."  The coaching staff and trainers described and treated Dr. Anderson as an esteemed doctor and friend of the team.

122.     Players were told that it was their responsibility to not miss any appointments and to "follow the doctor's orders" to minimize time off the field with injury or illness.

123.     The UM athletic staff drilled into the players that "Michigan Men" are tough, do not whine or complain, and stick together, among other mandates.

124.     Under this guidance and atmosphere, Plaintiff decided not to bring attention to himself.

125.     Plaintiff suffered a knee injury during Spring Training during his sophomore year.

126.     Plaintiff's injury required many *ad hoc* appointments with Dr. Anderson to drain the fluid from Plaintiff's knee, as well as regular weekly visits.

127.     During these visits for Plaintiff's knee injury, Anderson would still have Plaintiff undress, and Anderson would fondle Plaintiff's genitals.

128.     Plaintiff realized the genital fondling did not relate to his injury, and the abuse began to affect him seriously.

129.    Bo Schembechler had just started as head coach, and Spring Training was his first look at the players. Plaintiff felt pressured to present as a devoted team member and to continue his visits with Anderson.

130.    These regular visits carried on for about two months until Anderson cleared Plaintiff to play.

131.    Plaintiff was already ashamed to be injured and moved to the "red shirt" squad.

132.    Because of this, and because of the coaching staff's emphasis on being a "Michigan Man," Plaintiff continued to suffer during his appointments with Dr. Anderson.

133.    After this abuse began, Plaintiff's life quickly deteriorated.

134.    Plaintiff felt trapped, belittled, violated, and sick. He lost his confidence, his ambition, and his motivation to be a part of the Michigan football team.

135.    Plaintiff no longer aspired to work as hard as he had, both in football and in the classroom. Interactions with coaches and teammates became strained.

136.    Plaintiff fell into a deep depression for the first time.

137.     Plaintiff had to drop courses that semester to avoid failing grades. This caused a deficiency in credits, preventing Plaintiff from receiving his undergraduate degree after his four-year tenure.

138.     Plaintiff developed horrible stomach pain with severe spasms.

139.     Plaintiff had a high school sweetheart, with whom he was chaste. Anderson's abuse was the first time someone other than Plaintiff had touched Plaintiff's genitals.

140.     Plaintiff's girlfriend came to visit him at UM, and she was distressed at his current state. He was unable to tell her—or anyone—about what was happening to him.

141.     After his girlfriend's visit, Plaintiff attempted to address his symptoms. To avoid his coaches sending him to Anderson, Plaintiff went to the student health clinic where he was prescribed a combination of muscle relaxant and a sedative. Upon information and belief, the prescription was for Librium, a combination of Librax and Valium.

142.     At the student health clinic, Plaintiff's problems were determined to be emotional, and he was referred to a psychiatric intern.

143.     The intern treated Plaintiff condescendingly. The intern did not introduce himself and did not shake the Plaintiff's hand, spoke in hushed tones, and seemed to not view Plaintiff as a competent young man.

144.     Plaintiff stopped seeing the psychiatric intern, as he was taught to believe that "Michigan Men" do not need therapy.

145.     Soon after, Plaintiff developed a horrendous and life-altering effect of suffering abuse by Anderson when he began experiencing urges to expose himself to girls.

146.     At UM, Plaintiff did this several times at the library. Plaintiff was pleased if women showed interest, possibly to affirm to himself that women were interested in his genitals.

147.     The behavior was later diagnosed as symptoms of obsessive-compulsive personality disorder (OCD).

148.     Upon information and belief, there were no reports made of Plaintiff's exposures, or the complaints were ignored.

149.     Plaintiff remained on the football team.

150.     To avoid Anderson at all costs, Plaintiff did not report additional athletic injuries.

151.     The most serious injury Plaintiff experienced was a shoulder joint and nerve injury that left him unable to perform even as a practice squad member. Any contact with his shoulder or arm left Plaintiff unable to move his left arm for 5-10 minutes.

152.     Plaintiff never sought treatment for this injury, and shoulder problems have followed him for 50 years.

153.     Plaintiff married his high school sweetheart the summer before his senior year. He expected his aberrant behavioral urges to dissipate with the marriage. They did not.

154.     Plaintiff was asked to leave the football team his senior year, upon information and belief, due to his apathy and his inability to physically contribute. He was allowed to keep his scholarship.

155.     Plaintiff completed his senior year at UM but did not graduate in time because he was a few credits short, caused by the classes he dropped.

156.     With his wife's support, Plaintiff recovered academically enough to be accepted to the UM School of Dentistry.

157.     While in dental school, Plaintiff's serious OCD urges surged during times of stress.

158.     Plaintiff attempted therapy for the first time.

159.     This first attempt at therapy was with a couples' behavioral therapist that directed Plaintiff and his wife to have sexual encounters with other couples. This advice was very stressful to their relationship and did not help Plaintiff heal.

160.     Around this time, Plaintiff was arrested for the first time and nearly

expelled from dental school. Plaintiff's wife was pregnant with their first

child during this time, but she miscarried, possibly due to the stress.

161.     Plaintiff was ordered to therapy, but again, it was couples' therapy.

162.     Plaintiff was reluctant to discuss the abuse in joint therapy. He chose a

form of therapy that deals with current issues and corrective actions rather

than dwelling on the past, and he did not bring up the abuse.

163.     Plaintiff and his wife moved to Vermont so Plaintiff could start a dental

practice upon graduation from dental school.

164.     Despite Plaintiff's sexual functions being altered by the trauma of

Anderson's abuse, Plaintiff and his wife had three boys born from 1978 to

1980.

165.     Plaintiff continued to try psychiatric therapy, but it was ineffective.

166.     In the late 1970s, Plaintiff was arrested for the second time for indecent

exposure and banned from the University of Vermont library.

167.     Plaintiff was arrested for indecent exposure in 2003 for a third and final

time.

168.     Plaintiff's oldest son was with him when he was arrested.

169.     Plaintiff's oldest son later developed depression and other mental health

concerns.  As an adult, he lost his life to suicide.

29

170.     Plaintiff fears that his own failings caused or exacerbated his son's depression and may have led to his death.

171.     After the third arrest in 2003, Plaintiff finally found a therapist who recognized his OCD and prescribed medication that effectively treated his inappropriate sexual urges.

172.     Plaintiff experiences severe traumatization any time he forces himself to bring up what Anderson did to him and how much it has affected his life.

173.     When Plaintiff learned of the investigation into Anderson's abuse, he began reflecting on his trauma.  Consequently, some of his physical and psychological problems resurfaced, including stomach pain, sleeplessness, apathy, and depression (despite taking a regular antidepressant medication).

174.     The individuals in charge while Plaintiff attended UM enabled a prolific abuser to inflict harm on hundreds of victims.

175.     Anderson's abuse not only derailed Plaintiff's life, but it affected and continues to affect the lives of his loved ones.

<u>**COUNT I**</u>
**FRAUDULENT CONCEALMENT**

176.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

177.     MCL § 600.5855 tolls the statute of limitations for the claims contained in this Complaint and states in relevant part that:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

178.   Defendants through their employees, agents, representatives, as well as Anderson himself fraudulently concealed the existence of Plaintiff' claims by: (1) concealing from Plaintiff that the medical examinations conducted by Anderson were actually sexual abuse/assault/molestation, (2) concealing from Plaintiff that Defendants had knowledge of Andersons sexual abuse and did nothing to prevent it, (3) telling Plaintiff their procedures were normal and necessary, (4) publishing a statement that Anderson was a trustworthy and renowned doctor in a publication delivered to and read by university students, and (5) concealing from Plaintiff that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity as a "person who is liable for the claim," as set forth below:

179.   Anderson made the following affirmative representations to Plaintiff:

a.   Anderson's actions including, but not limited to, genital groping/manipulation and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

b. Anderson was not sexually assaulting Plaintiff;

c. Anderson's actions including genital groping/manipulation and digital anal penetrations were necessary and proper medical treatments even though many patients, including Plaintiff, were healthy male students between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

d. Plaintiff should not question and/or report Anderson to authorities;

e. Defendants, through their employees, agents, and/or representatives were aware of Anderson's conduct and continued to unnecessarily subject Plaintiff to Anderson's perverted examinations and believed such examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial; and

f. There was no possible cause of action against Anderson and/or Defendants.

180. Anderson's representations were false; and UM's Public Safety Department recently investigated medical professional contact, which established that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college students.

32

181.     Anderson knew the above-mentioned representations were false. He engaged in the sexual assaults for his own sexual gratification and/or pleasure.

182.     Anderson knew genital examinations and digital anal penetrations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty, particularly as the patients including Plaintiff were healthy college-aged men.

183.     Anderson's representations were material, in that Plaintiff would have stopped treating with Anderson had they known Anderson's representations were false.

184.     Anderson's representations were made with the intent of inducing reliance from Plaintiff as Anderson sought to continue sexually assaulting Plaintiff and others as evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiff and others while employed by UM.

185.     Anderson's representations were also made with the intent of concealing from Plaintiff that they had a cause of action against UM/Anderson.

186.     Plaintiff relied on Anderson's representations, leading him to continue receiving treatment from Anderson.  Had he known Anderson's above-mentioned representations were false, Plaintiff would not have treated with Anderson.

187.    Anderson knew that Plaintiff were susceptible, and Plaintiff were in fact, especially susceptible to believing Anderson's misrepresentations because:

a.  Plaintiff was a young and naïve man when he was abused by Anderson;

b.  Plaintiff had no prior experience with genital/anal examinations and therefore it was impossible for him to determine whether the treatment he received was sexual assault or a legitimate and proper medical treatment;

c.  Anderson's representations were reinforced by his support/statements made from UM representatives that Anderson was a trustworthy and reputable physician who was not to be questioned;

d.  Anderson's representations were made within the scope of a pervasive culture at UM's representatives of downplaying and normalizing Anderson's behavior;

e.  Plaintiff was ignorant to Anderson's sexual assaults as there were no other medical professionals, parents, guardians, caregivers, or others in the room to observe Anderson and question his actions/discover that his treatments were actually sexually abusive and this concealment from other adults/professionals deprived them of the opportunity for Plaintiff to realize he had been sexually assaulted and had a cause of action;

f.  According to neuroscientists, the prefrontal cortex of the brain, used to distinguish right from wrong and make decisions, is not fully developed until 25 years of age;

g.  Plaintiff was intimidated by Anderson's reputations and notoriety within the UM community;

h.  Plaintiff also trusted Anderson due to his position within UM and his notoriety and reputation;

i.  Plaintiff relied on UM's statements that Anderson was a legitimate and trustworthy medical professional;

j.  Plaintiff was unaware and had no reason to believe that he could potentially sue or had a cause of action because of his young age and lack of knowledge of the civil justice system and applicable remedies at law;

k.  UM concealed allegations of Anderson's abuse from other students and the public at large and Plaintiff was therefore unaware of other students coming forward with allegations and had no reason to believe he had a possible lawsuit or cause of action;

l.  Plaintiff had not previously known about allegations in the media regarding sexual assaults/abuse by Anderson, as no such reports existed; and

m. Plaintiff was never told by Anderson that his actions during medical examinations were sexual in nature, unlike other victims of sexual abuse who are sometimes informed by their abusers that the conduct is sexual in nature and to not tell their parents or other people.

188. Accordingly, Plaintiff did not know and could not have reasonably known, and was reasonably unaware that he had possible cause of action against Anderson and/or UM until he read an article published on or about January 19, 2022, regarding a settlement reached between UM and former UM students abused by Anderson, at which point Plaintiff became aware he too was a victim of Anderson's sexual abuse and that UM indirectly and directly caused the abuse as the school had knowledge that Anderson was a sexual predator and failed to protect its students.

189. Anderson, as a physician who Plaintiff trusted with his care, also breached a fiduciary duty owed to Plaintiff and therefore his failure to disclose material information was fraudulent.

190. Anderson further concealed the fraud by affirmative acts designed and/or planned to prevent inquiry, so that he and Defendants would escape investigation, in that he:

a. Prevented other medical professionals, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff when he sexually assaulted Plaintiff and other victims; and

b. Did not abide by or follow the standard of care which requires another medical professional, parent, coach, trainer, guardian, and/or caregiver be in the room during the examination and treatment of patients.

191. Anderson's representations caused Plaintiff's injuries/damages related to (1) sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assaults on or about January 19, 2022; and (3) discovering Plaintiff's beloved alma mater, UM, to which he devoted his life, in many respects, betrayed them by placing him in the care of a known sexual predator.

192. Plaintiff incorporates, by reference, the paragraphs above and below regarding damages he suffered because of UM's responsibility for Anderson's sexual assaults, UM's awareness of and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's own fraudulent misrepresentations.

193. Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so that he and Defendants would escape investigation.

194.    At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of UM and operated within the scope of his employment, and his negligence is imputed to UM.

195.    Plaintiff was free of any contributory negligence at all times pertinent to this action.

196.    Defendants, through their employees, agents, and representatives, also made affirmative representations to Plaintiff including, but not limited to the following:

a.  Anderson was a trustworthy and celebrated doctor within UM's highly touted Health Care System as evidenced by their statements in Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980, which stated: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine...his many contributions to health care are acknowledged...The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him;"

b.  Anderson was to be trusted and not questioned, as his services were worthy of recognition by UM dedicating the aforementioned Annual Report to him, even though UM and its executives knew that Easthope had fired Anderson for his wrongful sexual conduct toward male students;

c.  Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

d.  Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, and are such when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

e.  Plaintiff was required to be subjected to Anderson's treatments, as they were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

f.  Anderson would treat Plaintiff's ailments and injuries in an ethical and competent manner, and therefore in a non-criminal manner;

g.  Anderson was not sexually assaulting Plaintiff;

h.  Plaintiff should not question and/or report Anderson's conduct to appropriate authorities;

       i.   These affirmative representations were reasserted each time Defendants sent a student to Anderson for treatment. Each such referral was thus an affirmative representation that Anderson was competent, ethical, and respectful of his students, and would otherwise "do no harm" to them; and

       j.   There was no possible cause of action against Anderson and/or UM.

197.    Defendants' representations were false. The UM's Public Safety Department's 2020 investigation involving contact with medical professionals established that such genital examinations and digital, anal penetrations are almost never necessary for any physical and/or medical treatment of any other issues typically experienced by college students.

198.    Defendants knew these representations were false, as they received several complaints regarding Anderson's sexual assaults before or during 1968, prior to Plaintiff arriving on campus. Defendants also removed Anderson from his position as UHS Director in 1979 due to these allegations of sexual assault, thus showing UM had knowledge the representations were false.

199.    Defendants made the material representations knowing they were false, or made such representations recklessly, without any knowledge of their truth, and in a positive assertion, despite having previously received similar

complaints of Anderson's abuse from other students, and thus knew Anderson's genital examinations and digital, anal penetrations had been questioned in the past.

200.     Defendants' representations were material, so much so that had Plaintiff known the representations were false, he would have stopped seeking and/or treating with Anderson immediately.

201.     Defendants' representations were made with the intent that Plaintiff and other students would rely on them, such that UM could therefore prevent Plaintiff from discovering he had a cause of action against Anderson and UM.

202.     Plaintiff did in fact rely on Defendants' representations, and thus treated with Anderson and continued to do so; had Plaintiff known Defendants' representations were false, Plaintiff would have never treated with Anderson.

203.     Defendants concealed this fraud through affirmative conduct designed and/or planned to prevent investigation and/or inquiry into the matter, and to prevent future discovery of fraud, as they:

    a.  Refused to terminate Anderson, thereby validating his conduct through his continued employment as a physician at one of the world's most esteemed institutions of higher education;

b. Affirmatively lied in written publications about Anderson "resigning" from UHS when, in truth, Anderson was fired, subsequently reinstated, and then demoted for his assaults on male students;

c. Hid Anderson's past, present, and future sexual abuse of young men from the public;

d. Ignored, refused, and ultimately failed to inquire, investigate, and/or question complaints made by students regarding Anderson's conduct, and thus failed to act regarding Anderson's genital and anal examinations; and

e. Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers to be present during physical and/or medical examinations of a minor or young student by a treating physician.

204. Defendants knew that Plaintiff was, and Plaintiff was in fact, particularly vulnerable to trusting, believing, and relying on Defendants' representations because:

a. Plaintiff was a young, naïve man when abused by Anderson;

b. Defendants' representations were made within a pervasive culture forged by statements from UM representatives, which claimed Anderson's treatments were necessary; that Anderson was competent and ethical; and that Anderson was to be trusted, never questioned;

c.  Plaintiff had no prior experience with legitimate, appropriately performed treatments involving genital and/or anal examinations, making it impossible for Plaintiff to identify Anderson's conduct as sexual assault, rather than a legitimate, appropriate examination as believed;

d.  Plaintiff had no possible way of knowing the wrongfulness of Anderson's conduct because there were no parents, guardians, caregivers, and/or other medical professionals present during the genital and anal examinations to witness, question, and/or discover that such procedures were indeed sexual assaults, and to thus inform Plaintiff that he had been sexually assaulted and had a cause of action;

e.  Based on Neuroscience, the prefrontal cortex of the brain, which is used to make decisions and distinguish right-from-wrong, is not fully developed until near age twenty-five (25), and thus allows teenagers to make better judgments as the cortex matures over time;

f.  Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

g.  Plaintiff relied on UM's Administration and trusted Anderson due to his notoriety;

h.  Plaintiff, as a young man with no knowledge or awareness of the civil justice system, had no reason to believe and lacked awareness of the possibility that he could sue, or had a possible cause of action for civil redress;

205.  Plaintiff had no reason to believe or be aware that he could sue, since Anderson and UM actively concealed allegations of abuse brought by other students, thereby making Plaintiff unaware of these other claims and any possible actions to be had:

a.  Plaintiff had never heard, by way of media, any allegations of sexual assault or misconduct levied against Anderson due to Anderson and UM's concealment; and

b.  Plaintiff was never told by Anderson himself that his genital and anal examinations were sexual in nature, unlike other victims of sexual abuse who are instructed such conduct against them is sexual and is thus to be hidden and concealed from their parents and others.

206.  In accord with the above, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of any possible cause of against he had against Anderson and/or Defendants until on or about January 19, 2022.

207.    On or about January 19, 2022, Plaintiff read an article discussing a settlement reached between UM and survivors of Anderson's abuse.

208.    At this time, Plaintiff became aware that he too had been victimized by Anderson's sexual abuse, and that Defendants had directly and/or indirectly caused the abuse by knowing Anderson was a sexual predator, but choosing not to stop, prevent, or deter the harm Anderson caused to students.

209.    Along with its affirmative, false representations, UM officials, agents, and representatives failed to inform Plaintiff that he was being sexual abused by Anderson; and that Anderson, as a predator, had a history of committing sexual assault under the guise of "medical treatment."

210.    As a fiduciary to Plaintiff, UM had a duty to disclose such material information to Plaintiff, and its failure to do so thus constitutes a fraudulent act.

211.    At all times relevant to this action, Defendants' employees, staff, managers, supervisors, and directors were indeed employees, agents, apparent agents, and/or servants of Defendants, and operated within their scope of employment; their Fraudulent Concealment is thus imputed to Defendants.

212.    Defendants' representations caused Plaintiff's injuries relative to: (1) Anderson's repeated sexual assaults; (2) discovering that Anderson's "treatment" was in fact sexual assault, learned on or about January 19, 2022;

and (3) knowledge that Plaintiff' university, to which he had devoted their life through academics and athletics, had placed him in the hands of a known sexual predator, thus compromising his physical, mental, and emotional well-being.

213.    Plaintiff incorporates by reference the paragraphs above and below regarding damages suffered; and attributes such to UM's responsibility for, and failure to address and/or stop, Anderson's sexual assaults; its awareness and responsibility for Anderson's fraudulent misrepresentations about his conduct/treatment; and its own fraudulent misrepresentations about the same, as well.

214.    Defendants have committed Fraudulent Concealment for the reasons set forth above and below.

## COUNT II
## DELIBERATE INDIFFERENCE
## TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972
## 20 U.S.C. § 1681(A), *ET SEQ.*

215.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

216.    Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(A) (Title IX) assures that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial assistance …"

217.     Plaintiff is a "person" under Title IX's statutory language and thus warranted its protections.

218.     UM receives Federal financial assistance for its "education program" and is, therefore, subject to Title IX's statutory provisions.

219.     As a school subject to Title IX, the UM is required to investigate all matters of sexual violence including, but not limited to, sexual assault, abuse, and harassment, which extends over all academic programs belonging to the University, and any such conduct by its employees, students, and third parties.

220.     Anderson's conduct (i.e., sexual assault) occurred within, and was carried out under a UM medical program designed to provide medical treatment to students and/or the public.

221.     Anderson's conduct toward Plaintiff, specifically his nonconsensual, unnecessary, and inappropriate manipulation of Plaintiff' genitals and anus, constitutes sex discrimination under Title IX.

222.     Beginning in or around 1968, an "appropriate person" at UM had actual knowledge of Anderson's sexual assault, abuse, and/or molestation of young men.

223.     Defendants were notified of Anderson's sexual assault, abuse, and molestation by multiple young male students in or around 1968, and then again in 1975 and 1979.

224.     Upon information and belief, Defendants were also notified of Anderson's sexual assault, abuse, and molestation on multiple occasions after 1980.

225.     Despite numerous complaints and notice of Anderson's sexual assault, abuse, and molestation, Defendants failed to inquire into, investigate, and/or stop Anderson's wrongful conduct as required by Title IX.

226.     After each complaint in 1968, 1975, and 1979, Anderson continued to sexually assault, abuse, and molest young male students, including but not limited to Plaintiff.

227.     Accordingly, Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation perpetrated on its premises, by:

     a. Failing to investigate and/or address allegations made by other victims of Anderson's sexual assault, abuse, and molestation, as required by Title IX;

     b. Failing to adequately investigate and/or address complaints regarding Anderson's sexual assault, abuse, and molestation, as required by Title IX; and

48

      c. Failing to execute corrective measures to prevent Anderson from violating, molesting, and/or sexually abusing other students and individuals, including minor persons.

228.    Defendants acted with deliberate indifference, as their failure to respond to allegations of Anderson's sexual assault, abuse, and molestation was certainly unreasonable considering the circumstances known to Defendants.

229.    Moreover, Defendants' response, or lack thereof, was clearly unreasonable as Anderson continued his sexual assaults of students, third parties, and Plaintiff until Anderson left UM in 2003.

230.    Defendants' failure to investigate, respond to, and/or remedy Anderson's sexual assaults after notice of such conduct subjected Plaintiff to promptly, appropriately, and necessarily continued harassment and a sexually hostile environment, effectively denying Plaintiff "participation" in, "benefits" from, and access to educational opportunities at the UM, including Plaintiff' medical care.

**COUNT III**
**STATE CREATED DANGER**
**42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT**

231.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

232.    At all relevant times, Defendants and Anderson—as Defendants' agent—were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

233.    According to United States Constitution, the Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of the law."

234.    Defendants deliberately subjected Plaintiff to the care and/or treatment of Anderson—a known sexual predator—regardless of Defendants' knowledge that Anderson could and would cause damage to Plaintiff and other male students by way of sexual assault.

235.    Defendants' conduct and culpability is blatant and extreme.

236.    As a result of Defendants' decision to not investigate the complaints about Anderson beginning in 1968; to avoid corrective measures following Anderson's abuse; and to keep Anderson employed at the UM, Plaintiff became the foreseeable and certain victim of foreseeable sexual assault.

237.    These decisions made by Defendants deprived Plaintiff of a safe campus and constitute affirmative actions intended to cause and/or increase the risk of harm done to Plaintiff, including any physical and emotional injuries.

238.     Defendants have thus acted with willful disregard for Plaintiff's safety and have breached their fiduciary duty to protect students, like Plaintiff, from harm, by placing Plaintiff in the hands of a sexual predator, and thereby allowing Anderson's sexual assaults to occur.

239.     Defendants therefore provided Anderson—a known sexual predator—the abhorrent opportunity to sexually assault Plaintiff upon their failure to investigate complaints beginning in 1968, to take corrective measures following Anderson's abuse, and to employ Anderson notwithstanding knowledge of his wrongdoings.

## COUNT IV
## VIOLATION OF THE RIGHT TO SUBSTANTIVE DUE PROCESS BODILY INTEGRITY
## 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT

240.     Plaintiff realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

241.     The Due Process Clause of the Fourteenth Amendment assures an individual the implied right to bodily integrity, including the right of the individual to be free of sexual assault, abuse, or molestation.  Plaintiff enjoyed those rights.

242.     The acts committed by Anderson as alleged herein constitute a violation of these well-established, constitutionally protected rights of which a reasonable person in Defendants' position should have known.

243.     At all relevant times, Defendants and Anderson, as Defendants' agent, were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

244.     Pursuant to custom, policy, and/or practice, Defendants had, and continue to have, the ultimate responsibility and authority to investigate complaints levied against their employees, agents, and representatives, whether raised by persons including, but not limited to, University students, visitors, faculty, staff, or other employees, agents, and/or representatives.

245.     Defendants failed to fulfill and execute this responsibility and authority, thus amounting to deliberate indifference.

246.     Additionally, Defendants were required to prevent, deter, and/or address all incidents regarding sexual assault, abuse, and/or molestation occurring on their campus or premises, as is established by the Constitutional provisions and Title IX.

247.     Aside from those by Plaintiff, Defendants failure to address the complaints of Anderson's many other patients led to an undetermined number of persons being victimized by Anderson's sexual assault, abuse, and molestation; such failures include Defendants' lack of response to complaints against Anderson beginning in 1968, 1975, and 1979.

248.     Defendants ultimately failed to adequately investigate the complaints brought by Plaintiff and other similarly situated victims upon information of Anderson's sexual assaults, which includes Defendants':

    a.  Failure to remove Anderson from a position of authority with access to a large population of young naïve men who would be unlikely to complain about Anderson's conduct;

    b.  Failure to perform a thorough investigation into Anderson's improper conduct upon receiving numerous complaints regarding his abuse; and

    c.  Failure to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Anderson.

249.     Defendants failed to respond to reports of Anderson's sexual assault, abuse, and molestation in a clearly unreasonable manner, and thereby failed to prevent such conduct and harm to Plaintiff and other victims caused by Anderson. Defendants acted with deliberate indifference and are thus liable to Plaintiff under 42 U.S.C. § 1983.

250.     Defendants tolerated, authorized, and/or permitted a policy, procedure, practice, or custom that allowed for the inadequate screening, insufficient supervision, and nonexistent discipline of Anderson, such that Anderson was allowed to violate the rights of those such as Plaintiff with impunity.

251.    Because Defendants policies, practices, and customs contributed to Plaintiff's harm by allowing Anderson's sexual assaults to continue, thereby depriving Plaintiff of his rights secured by the United States Constitution, Defendants are further liable to Plaintiff under 42 U.S.C. § 1983, as well.

**COUNT V**
**FAILURE TO TRAIN AND SUPERVISE**
**42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT**

252.    Plaintiff realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

253.    At all relevant times, Defendants and Anderson, as Defendants' agent, were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

254.    It is Defendants' ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, including faculty and staff such as Anderson, regarding duties owed toward students, colleagues, and visitors.

255.    These duties include specific responsibilities relative to identifying, reporting, and/or addressing sexual misconduct on Defendants' campus or premises.

256.    Defendants failed to train and supervise their employees, agents, and/or representatives, including faculty and staff such as Anderson, regarding the following duties:

    a.  Perceiving, reporting, and stopping inappropriate sexual conduct on campus;

    b.  Providing ready, diligent, and ongoing supervision over students and other individuals, including Anderson;

    c.  Reporting suspected incidents of sexual assault, abuse, or molestation;

    d.  Establishing and ensuring the safety of all students, faculty, staff, and visitors to the UM campus and/or premises;

    e.  Providing a safe environment for all students, faculty, staff, and visitors to UM's premises, free from sexual harassment; and

    f.  Properly training faculty and staff to be aware of their individual duty to create and maintain a safe environment on the UM campus and/or premises.

257.    Notwithstanding the importance of those duties, Defendants failed to adequately train faculty and staff, including athletic coaches, trainers, and medical personnel, on those duties, thus leading to Defendants' violation[s] of Plaintiff's Constitutional and statutory rights.

258.     This failure to train is the direct result of Defendants' deliberate indifference towards the well-being of its students, including their physical, mental, and emotional health.

259.     Defendants' failure is a proximate cause of Plaintiff's injuries.

260.     Defendants deprived Plaintiff of his right to Due Process as provided by Fourteenth Amendment to the United States Constitution and are thus in direct violation of 42 U.S.C. § 1983 and liable to Plaintiff accordingly.

**COUNT VI**
**SEX DISCRIMINATION**
**MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**M.C.L. § 37.2101, *ET SEQ.***

261.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if state herein.

262.     Michigan's Elliott-Larsen Civil Rights Act (the Act) provides that "[t]he opportunity to obtain … the full and equal utilization of public accommodations, public service[s], and educational facilities without discrimination because of … sex … [is] a civil right."

263.     UM is a place of "public accommodation, public service, and educational facili[ty]" as envisioned by the Act and the institutions to be covered.

264.    Accordingly, Plaintiff enjoyed the right to obtain and/or achieve the "full and equal utilization" of UM and any educational programs, facilities, and/or services it had to offer.

265.    Anderson is a "person" as defined by the Act.

266.    At all times relevant, Anderson was an agent of UM.

267.    Plaintiff's sex was at least one substantial factor that motivated Anderson to select Plaintiff as a victim of his sexual assaults.

268.    Therefore, had Plaintiff been female, he likely would not have been the target of Anderson's sexual assaults and abuse.

269.    By allowing Anderson to access Plaintiff *vis-à-vis* medical treatment as a physician on the UM campus, Defendants, through their agents, representatives, and employees, including Anderson, were predisposed to discriminate against Plaintiff based on sex, and acted in accordance with that predisposition.

270.    Similarly, by giving Anderson such access to Plaintiff as his treating physician, Defendants, through their agents, representatives, and employees, including Anderson, treated Plaintiff differently than similarly situated female students, to whom Anderson was not given access by UM in the same unfettered manner to which Anderson was given access to young male students, based on the unlawful consideration of sex.

271.     Defendants thus subjected Plaintiff—because of his sex—to physical, sexual conduct that had the purpose or effect of denying Plaintiff the "full and equal utilization" of UM educational program, and denied him similar access to any privileges, accommodations, and/or services available to students at UM as well.

272.     Defendants have therefore deprived Plaintiff of a civil right[s] defined and entrenched in the Act and are thus liable to Plaintiff accordingly.

<u>**COUNT VII**</u>
**VIOLATION OF THE RIGHT TO SUBSTANTIVE DUE PROCESS**
**BODILY INTEGRITY**
**MICHIGAN CONSTITUTION, ARTICLE 1, § 17**

273.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

274.     The Due Process Clause of the Michigan Constitution is coextensive with its federal counterpart, and thus provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law …"

275.     Accordingly, Michigan's Due Process Clause recognizes various substantive due process rights that protect the unenumerated, fundamental liberties of all citizens afforded by both federal and state constitutions.

276.     Through time, precedent has thus established that one such "liberty" protected by Michigan's Due Process Clause is an individual's right to bodily integrity free from unjustifiable government interference.

277.    This right to be free from state-occasioned damage to bodily integrity, and that to be in possession and control of one's own person, has been acknowledged by the United States Supreme Court and the courts of Michigan as necessitating the most careful guard; and to be kept sacred, and free from the restraint and interference of others unless clear and unquestionable law suggests otherwise.

278.    Violating this right involves an egregious, nonconsensual entry into the body constituting an exercise of power without any legitimate government objective.

279.    Moreover, this violation must be so egregious and outrageous, that it can be fairly said to shock the contemporary conscience.

280.    Defendants, pursuant to official policies, practices, and customs, violated Plaintiff's right to bodily integrity by actions and inactions that include:

  a. Failing to supervise, train, and/or educate Anderson, Anderson's managers, and/or Anderson's patients or their parents, so that in the absence of said supervision, training, and education, Anderson's sexual assault, abuse, and molestation could not be carried out;

  b. Actively and purposefully concealing Anderson's abhorrent behavior; and

c. Failing to investigate student complaints against Anderson beginning as early as 1968, including the subsequent failure to take corrective actions in response to Anderson's abuse, thus allowing Anderson to remain as a physician at UM and have unfettered access to male students, despite knowledge that Anderson was a sexual predator who victimized such persons under the guise of medical treatment.

281. Defendants' policies, practices, and customs, and their correlating failures, gave Anderson ease-of-access to male students serving as potential victims, thereby exposing such students like Plaintiff to Anderson's abhorrent violations of bodily integrity so egregious, and so outrageous, that it shocks the conscience.

The decisions and failures alleged herein—those which violated Plaintiff's Due Process rights—were made by Defendants' high-level officials.

## <u>COUNT VIII</u>
## VIOLATION OF THE RIGHT TO SUBSTANTIVE DUE PROCESS
## STATE CREATED DANGER
## MICHIGAN CONSTITUTION, ARTICLE 1, § 17

282. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

283. The Michigan Constitution affords the individual, including Plaintiff, a substantive Due Process right to avoid the risk of harm or danger created or increased by an affirmative act of the State.

284. This right is therefore violated when the state: (1) engages in an affirmative act that either creates or increases the risk that a plaintiff will be exposed to a violent act by a third party; (2) that affirmative action does place a plaintiff in a special risk/danger, as opposed to a risk affecting the public at large; and (3) the state knew or should have known that its actions specifically endangered Plaintiff.

285. Defendants' actions, as an arm of the state/public state institution, constitute actions on behalf of the state.

286. Defendants did create and increase the risk that Plaintiff would be exposed to an act of violence by a third-party (i.e., Anderson) by conduct that includes: (1) permitting, condoning, and/or reassigning Anderson within the UM medical program, such that Anderson was given access to young male patients, and thereafter sexually abused those patients with what he and Defendants considered "medical treatment;" and (2) concealing, ignoring, and/or neglecting as product of policy, practice, or custom the knowledge that Anderson was continuing his unlawful, abhorrent behavior.

287. These affirmative acts created or increased the risk of Plaintiff's exposure to an act of violence or sexual assault by Anderson.

288. This risk of violence or assault thus posed a special danger to Plaintiff and similarly situated individuals, because the state's conduct subjected this group—young men—to the risk of Anderson's abhorrent behavior, despite the state's knowledge that Anderson was manipulating the doctor-patient relationship to perpetrate sexual violence against this group of persons.

289. Accordingly, Defendants knew or should have known that these affirmative acts specifically endangered Plaintiff.

290. Moreover, Defendants had established official policies, practices, and customs, that permitted, if not condoned and promoted Anderson's access to male students for the purpose of inappropriately groping their genitals or digitally penetrating the anus during medical treatment.

291. Defendants' official policies, practices, and customs violated Plaintiff's right to be free from a state-created danger; the violation brought about by each of the following misconducts:

    a. Failing to supervise, train, and/or educate Anderson, Anderson's managers, and/or Anderson's patients or their parents (if the victim was a minor at the time of assault), so that in the absence of said supervision,

training, and education, Anderson's sexual assault, abuse, and molestation could not be carried out;

b. Actively and purposefully concealing Anderson's abhorrent behavior;

c. Failing to investigate student-complaints beginning as early as 1968, including the subsequent failure to take corrective actions in response to Anderson's abuse, thus allowing Anderson to remain as a physician at UM and have access to male students, despite knowledge that Anderson was a sexual predator who victimized such persons under the guise of medical treatment; and

d. Not terminating Anderson when it became known he was a sexual predator.

292. Lastly, Defendants policies, practices, and customs permitted, condoned, and ultimately made possible the reassignment of Anderson, thereby giving him [Anderson] a continuing access to young male students and third-party individuals, thereby threatening such persons and Plaintiff with invasions of bodily integrity so egregious and outrages they shock the conscience.

293. Those decisions and failures above causing Defendants to shamefully violate Plaintiff's Constitutional rights, and his freedom to avoid and be free

of particularized, state created risks, were made by Defendants' high-level officials.

## COUNT IX
## GROSS NEGLIGENCE

294.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

295.    Defendants owed to Plaintiff a duty to use due care in ensuring his safety and that of similarly situated individuals, including safety and freedom from sexual assault, abuse, and/or molestation at the hands of Defendants' employees, representatives, and/or agents, including Anderson.

296.    However, Defendants breached this duty to Plaintiff by failing to adequately supervise Anderson, even after notice of complaints regarding Anderson's nonconsensual, sexual touching and penetration performed during genital and anal examinations.

297.    Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

298.    Similarly, Anderson, acting as Defendants' employee, agent, or representative, owed Plaintiff the same duty of due care when providing Plaintiff with medical treatment as created by the confidential doctor-patient relationship between Plaintiff and himself.

299.     Anderson breached this duty to Plaintiff by and through his sexual assaults, abuses, and molestations of Plaintiff, all having been committed in Anderson's scope of employment, agency, and/or representation of Defendants under the mask of "medical treatment."

300.     This conduct was so reckless as to demonstrate Anderson's substantial lack of concern for whether an injury would result to Plaintiff.

301.     By the actions above, Defendants have shown a willful disregard to take the necessary precautions once needed to ensure Plaintiff's safety from Anderson; and such disregard for the substantial risk Anderson posed to Plaintiff's safety as well.

302.     Defendants had thus breached their duties owed to Plaintiff through the acts of gross negligence outlined above, each showing a reckless disregard for Plaintiff' health, safety, and rights, and whether an injury would result therefrom, such that Defendants are liable to Plaintiff accordingly.

## COUNT X
## NEGLIGENCE

303.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

304.     Defendants owed to Plaintiff a duty of ordinary care in ensuring his safety and that of similarly situated individuals, including safety—and

freedom—from sexual assault, abuse, and/or molestation at the hands of Defendants' employees, representatives, and/or agents, including Anderson.

305.     Defendants breached this duty of ordinary care owed to Plaintiff by the following conduct, including, but not limited to:

    a.  Failing to adequately train and supervise Anderson; and

    b.  Failing to properly investigate, address, and/or remedy Anderson's abhorrent behavior despite employees, agents, and/or representatives having notice in 1968, 1975, and 1979 by way of complaint[s] that Anderson was engaged in conduct of a sexual nature related to his predatory, sexual examinations of young men's genitals and anuses.

306.     Accordingly, Defendants should have known, foreseen, and anticipated Anderson's sexual abuse of young male students beginning in 1968, and onward.

307.     Similarly, Anderson, acting as Defendants' employee, agent, or representative, owed Plaintiff the same duty of ordinary care when providing Plaintiff medical treatment as created by the confidential doctor-patient relationship between Plaintiff and himself.

308.     Anderson breached this duty to Plaintiff with each sexual assault, abuse, or molestation of Plaintiff, each incident being committed in his

Anderson's scope of employment, agency, and/or representation of Defendants under the mask of "medical treatment."

## COUNT XI
## VICARIOUS LIABILITY

309.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

310.    The doctrine of vicarious liability is based on theory of indirect responsibility and creates by operation of law an agency-relationship between the principal and its agent, such that the principal is held responsible for its agents' actions.

311.    In circumstances of employer-employee relationships, vicarious liability implies that an employer is responsible for the wrongs of his employee committed in the scope of employment.

312.    From approximately 1966 to 2003, Defendants employed and/or held out Anderson as their employee, agent, and/or representative.

313.    Accordingly, Defendants, as Anderson's principal/employer, had the right, duty, and/or ability to supervise Anderson's medical exams—and Anderson himself—to ensure the safety and well-being of Anderson's patients.

314.    Defendants had an obvious and direct financial interest in allowing Anderson to provide medical care for UM and to prevent these allegations from tarnishing the school's reputation.

315.    Defendants, as Anderson's principal/employer, are vicariously liable for Anderson's sexual misconducts alleged in the preceding Paragraphs, as such were performed during and in furtherance of Anderson's employment, agency, and/or representation of Defendants, and were subject to Defendants' right, ability, or duty of control through a faulty system of supervision.

## COUNT XII
## EXPRESS/IMPLIED AGENCY

316.    Plaintiff realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

317.    Under agency law, a principal may be liable for and/or bound by the acts of its agent if it represents to a third-party, either intentionally or negligently, that the agent is working on its behalf, with its authority, and the third-party reasonably relies on such representations.[4]

318.    An "agent," therefore, is someone authorized by actual or apparent authority to act on the principal's behalf.

---

[4] *See Deschamps v. Bridgestone Americas, Inc. Salaried Employees Ret. Plan*, 840 F.3d 267, 279 (6th Cir. 2016); *Chesterfield Exch., LLC v. Sportsman's Warehouse, Inc.,* 572 F. Supp. 2d 856, 866 (E.D. Mich. 2008).

319.     Defendants intentionally and/or negligently represented to Plaintiff that Anderson was their employee, agent, and/or representative, while simultaneously possessing the right to control Anderson's conduct by way of the principal-agent relationship.

320.     Based on Defendants' representations, Plaintiff reasonably believed that Anderson was acting as an employee, agent, and/or representative of Defendants, the principal/employer, and, therefore, had the authority to act on Defendants behalf and with Defendants' authority.

321.     Because of these reliances, Plaintiff was injured as a result of Anderson's sexual assault, abuse, and molestation as described in the Paragraphs above, each incident having occurred in the course of, and under apparent authorization by, Defendants as Anderson's principal/employer, on whom Plaintiff relied to provide him with medical professionals capable of reasonable skill and care.

## COUNT XIII
## NEGLIGENT SUPERVISION

322.     Plaintiff reallege and incorporate by reference the allegations contained in all prior paragraphs as if stated herein.

323.     Employers generally must take greater care to supervise employees whose past or current behavior suggests the employee poses a greater risk of harm to others.[5]

324.     Defendants owed a duty to Plaintiff and other similarly situated male students to reasonably supervise Anderson, their employee, agent, and/or representative, during his employment, agency, and/or representation, and while Anderson interacted with, or provided medical treatment to, Plaintiff and other young male students.

325.     Defendants owed this duty as it was foreseeable that Anderson posed a risk to Plaintiff and other young male students, as suggested by Defendants' firing, reinstating, and demoting Anderson in 1980, at which time Anderson committed predatory acts **against young male patients reported to the university**.

326.     Accordingly, Defendants, by and through their employees, agents, managers, and/or assigns, knew or should reasonably have known that Anderson's prior conduct (i.e., his abhorrent sexual behavior) rendered Anderson an unfit employee, agent, and/or representative requiring supervision given his threat to Plaintiff and other young male students.

---

[5] *See* Restatement of Employment Law § 4.04, comment d (2015).

327.     Defendants, by allowing Anderson's abhorrent sexual assaults to occur and/or continue, breached their duty to reasonably supervise Anderson, and through this breach allowed not permitted Anderson's acts, but allowed him to manipulate his position of power and authority over young male students.

328.     Anderson's sexual abuse occurred on the UM campus and/or premises, in the course/scope of Anderson's employment, agency, and/or representation of Defendants.

329.     Defendants thereby ultimately tolerated, permitted, and/or authorized a policy, practice, procedure, or custom providing insufficient supervision over its employees, agents, and/or representatives, including Anderson, and failed to adequately screen such individuals pursuant to this policy, practice, etc., thus allowing those like Anderson to violate the rights of others, like Plaintiff, with impunity.

## COUNT XIV
## NEGLIGENT FAILURE TO WARN OR PROTECT

330.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

331.     Beginning in or around 1968, Defendants had direct and/or constructive knowledge of Anderson's abhorrent, dangerous conduct as reported in complaints to the university.

71

332. Defendants therefore knew or should have known that Anderson had committed sexual assault, abuse, and/or molestation of Plaintiff and other young male students or was continuing to engage in such conduct.

333. Moreover, and with knowledge of Anderson's conduct, Defendants knew or should have known that Anderson posed a risk of harm to Plaintiff and other similarly situated men.

334. Accordingly, Defendants owed a duty to warn and/or protect Plaintiff and other individuals against the risk of injury Anderson posed.

335. Defendants further owed a duty to disclose this knowledge and information of Anderson's conduct and/or risk pursuant to the trusting, fiduciary doctor-patient relationship that existed between Anderson as Defendants' employee, agent, and/or representative, and Plaintiff.

336. Defendants breached this duty by failing to warn and/or protect Plaintiff from Anderson, which includes but is not limited to:

   a. Failing to respond to allegations of Anderson's sexual assault, abuse, and molestation;

   b. Failing to act on evidence of Anderson's sexual assault, abuse, and molestation; and

    c. Failing to investigate, adjudicated, and/or terminate Anderson's employment with UM prior to his treatment of Plaintiff and other similarly situated individuals.

337.    Furthermore, Defendants failed to adequately screen, counsel, and/or discipline Anderson for physical and/or mental conditions rendering him unfit to execute his duties and responsibilities as a physician at a university, resulting in violations of Plaintiff's rights.

338.    Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Anderson's sexual assault, abuse, and molestation.

**COUNT XV**
**NEGLIGENT FAILURE TO TRAIN OR EDUCATE**

339.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

340.    Defendants owed to Plaintiff and other young men the duty to implement reasonable protective measures intended to protect Plaintiff and these persons from Anderson's sexual assault, abuse, and/or molestations.

341.    Defendants, however, failed to take such reasonable protective steps, such as failing to properly train and/or educate Plaintiff and other similarly situated young men to avoid this risk of harm.

342.     Among other things, Defendants failed to implement reasonable safety measures to:

   a.  Prevent acts of sexual assault, abuse, and/or molestation;

   b.  Avoid Anderson's unsupervised contact with Plaintiff and other young male students, and positions that that allowed Anderson to victimize these persons;

   c.  Educate students like Plaintiff on reporting and/or preventing unwanted touching, penetration, and otherwise sexual conduct/advances from authority figures, considering UM knowingly allowed Anderson, its employee, agent, and/or representative and a sexual predator, to have contact with these students; and

   d.  Train and/or educate UM employees to recognize and be aware of improper touching, considering UM knowingly allowed Anderson, its employee, agent, and/or representative and a sexual predator, contact with young male students.

## COUNT XVI
## NEGLIGENT RETENTION

343.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

344.     Defendants owed a duty to Plaintiff and other similarly situated male students to exercise due care whenever hiring, retaining, screening, checking,

regulating, monitoring, credentialing, and/or supervising its employees, agents, and/or representatives.

345.    Defendants breached this duty, and were negligent in retaining Anderson as an employee, agent, and/or representative of UM after failing to adequately investigate, report, and/or address complaints regarding his sexual assaults, abuse, and molestations of which Defendants knew, or reasonably should have known.

346.    Moreover, Defendants were negligent in retaining Anderson after having discovered, or after having the reasonable opportunity to discover, Anderson's abhorrent conduct as an indication of his sexual, criminal propensities.

347.    Had Defendants terminated Anderson's employment, Plaintiff's injuries would not have occurred.

348.    Defendants' failure to act with due care allowed Anderson access to Plaintiff and other similarly situated individuals, and thus allowed for Anderson's sexual assault, abuse, and molestation of Plaintiff and other individuals.

349.    Accordingly, Defendants' negligent hiring, retaining, screening, checking, regulating, monitoring, credentialing, and/or supervising of its

employees, agents, and/or representatives, including Anderson, created a foreseeable risk of harm to Plaintiff and other young men.

## COUNT XVII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

350.    Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

351.    A defendant can be liable for the intentional infliction of emotional distress for extreme and outrageous conduct intended to cause or which recklessly causes a plaintiff to experience severe emotional distress.[6]

352.    This "extreme and outrageous conduct" is any act that defies the bounds of decency and is utterly intolerable by a civilized society,[7] thereby causing "emotional distress" so severe that no reasonable person could be expected to endure it.[6]

353.    Defendants, by and through the allegations above, allowed Anderson to hold employment that allowed his access to and sexual assault of Plaintiff and other young men, notwithstanding Defendants' knowledge of Anderson's conduct as deduced from student complaints beginning in 1968.

354.    This type of conduct is extreme and outrageous.

---

[6] *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993)(quoting *Dickerson v. Nichols*, 161 Mich. App. 103, 107-08, 409 N.W.2d 741 (1987)).

[7] *Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980)(quoting Restatement (Second) of Torts § 46, comment d (1948)); [6] Restatement (Second) of Torts § 46, comment j (1965).

355.     Moreover, Defendants actively touted Anderson as worth of high esteem and acclaim, thereby encouraging Plaintiff and other young male students to trust Anderson, and to refrain from questioning his medical treatments or motives, such as genital and anal examinations.

356.     Accordingly, a reasonable person would not expect Defendants' tolerance, permission, and/or authorization of Anderson's sexual assault, abuse, and/or molestation, nor Defendants' admiration of Anderson given his abhorrent sexual propensities.

357.     Furthermore, a reasonable person would not expect Defendants to neglect, forego, and/or find themselves incapable of supervising Anderson and/or preventing his sexual misconducts against Plaintiff and other similar situated male students, as did occur.

358.     Defendants conduct was therefore intentionally designed or recklessly executed to allow for Anderson's sexual abuse, resulting in Plaintiff's severe emotional distress.

## COUNT XVIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

359.     Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

360.     Defendants acted with negligence by providing Anderson with employment that gave him access, opportunity, and the ultimately ability to

sexually assault, abuse, and/or molest Plaintiff and other similarly situated young men.

  a. Defendants' negligence was the proximate cause of Anderson's sexual assault, abuse, and/or molestation of Plaintiff.

  b. Plaintiff has thus suffered damages directly related to Anderson's sexual assault[s], as well as damages related to discovering he was and is and a victim of Anderson's sexual misconduct tolerated, permitted, and/or authorized by his alma mater, UM.

  c. The combination of these events, including Defendants' own actions and Anderson's sexual assaults, naturally and probably resulted in Plaintiff's emotional distress.

  d. The combination of these events, including Defendants' own actions and Anderson's sexual assaults did in fact result in Plaintiff's emotional distress.

### COUNT XIX
### FRAUD AND MISREPRESENTATION

361.  Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

362.  Between 1968 and 2003, Defendants represented to Plaintiff and the public that Anderson was a competent, ethical, and safe physician employed by UM.

363.    Defendants further represented that Anderson, by and through his competence and ethics, was a trustworthy physician of high morals, and that Plaintiff need not worry about Anderson doing them any harm.   Defendants' representations were false.

364.    Between 1968 and 1979, Defendants received multiple complaints regarding Anderson's sexual assaults committed on male patients during genital and anal examinations.

365.    Defendants thus had knowledge that Anderson was committing and continuing to commit sexual assault, abuse, and molestation against Plaintiff and other similarly situated individuals.

366.    Although Defendants had knowledge of Anderson's conduct, they failed to investigate, remedy, or address it in any way, but instead held Anderson out as a competent and safe physician.

367.    In fact, Defendants misrepresented Anderson's firing as UHS Director in 1979 as a "resignation" via written/oral communications to the UM community and public; and yet, Defendants had knowledge that Anderson was instead fired, reinstated, and demoted because of his sexual, predatory conduct toward Plaintiff and other male students.

368.     Defendants made these representations with the intent that Plaintiff and other young male college students rely on them when seeking treatment from Anderson.

369.     Plaintiff relied on Defendants fraudulent assertions and continued to seek treatment from Anderson, despite Defendants' first-hand knowledge of the risk posed to Plaintiff because of Anderson's criminal sexual propensities.

370.     Plaintiff was therefore subjected to Anderson's sexual assault, abuse, and/or molestation because of Defendants' fraudulent misrepresentations regarding Anderson's fitness as a medical professional.

## DAMAGES

371.     On or about January 19, 2022, news outlets reported that a settlement had been reached between UM and former UM students abused by Anderson.

372.     That staff member was Dr. Robert Anderson, accused of committing multiple sexual assaults while treating students at UM or its UHS, which Anderson guised as routine medical treatments and/or examinations.

373.     At that time, Plaintiff learned that Anderson, who had treated him in the past, was a serial sexual predator.

374.     Plaintiff's damages arise from two distinct and exclusive harms:

   a.  Plaintiff's revelation that Anderson's prior treatment, which involved what were initially perceived as bizarre, strange acts, was in fact

criminal sexual conduct motivated by Anderson's abhorrent intent to assault, abuse, and/or molest students, thereby making Plaintiff one of Anderson's innocent victims; and

b. Plaintiff's revelation that UM, to whom Plaintiff had given his formative years and allowed to become a part of his life, had led him into the hands of a sexual predator, whom UM twistedly guised as a competent, concerned physician worthy of continued treatment and care.

375. Since these revelations, Plaintiff has experienced and/or continues to experience shame, shock, humiliation, embarrassment, loss of self-esteem, disgrace, and emotional distress (including the physical manifestations thereof).

376. Moreover, discovering the harm Anderson committed disturbed and/or continues to disturb Plaintiffs' sense of self-worth and identify, leading to Plaintiff's anxiety, depression, and emotional suffering.

377. Additional harms and/or damages to Plaintiff include:

c. The feeling of betrayal upon learning UM chose not to protect him from Anderson's known, anticipated abuse;

d. The feeling of betrayal upon learning UM led him to Anderson's care, notwithstanding Defendants' knowledge that Anderson was a predator;

e.  The worries and anxieties prompted by Plaintiff's fear that family or friends may learn that Plaintiff too is a victim of Anderson;

f.  Anxieties regarding the possibility of future and/or continued interactions with UM followings its storied betrayal of Plaintiff; and

g.  Anxieties associated with Plaintiff's uncertainty as to how these harms will manifest themselves in Plaintiff's immediate and distant future.

378.   Plaintiff's revelations have forced him to relive the trauma of what he now knows to be Anderson's sexual assaults, thereby damaging Plaintiff's emotional and psychological health upon this understanding that UM knowingly exposed him and others to Anderson's abuse during Anderson's employment from 1966 to 2003.

379.   As a direct and/or proximate cause of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, from the discomfort, shock, embarrassment, humiliation, grief, disgrace, loss of self-esteem, pain of mind and body, and emotional distress (and the physical manifestations thereof) associated with Anderson's sexual assault, abuse, and/or molestation, as may appear throughout discovery and trial.

380.   These injuries to Plaintiff amount to a series of irreparable harms commonly suffered by young men when sexually assaulted, abused, and/or molested by a trusted authority figure, such as a doctor.

381.     Symptoms of male sexual abuse deriving from those injuries include, but are not limited to, sexual dysfunction; the inability to engage in close relationships with others; confusion about one's sexual identity; and embarrassment and depression, all of which can last for decades.[8]

382.     The above injuries and symptoms are *especially harmful* when the perpetrator responsible is known and trusted by the victim.[9]

383.     When sexual abuse is perpetrated by a medical provider, patients often fail to understand the abuse occurred in relation to the provider's access to, trust, and authority over the victim, thereby causing common injuries of emotional distress, humiliation, and the inability to trust providers or the medical field, generally.[10]

384.     Accordingly, and because of some or all of the actions and/or inactions of Defendants described above, Plaintiff have, and will continue to suffer,

---

[8] *See Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).

[9] *See Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1: 24-24)); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAWI's Online Training Institute, May 2019, p. 34).

[10] *See Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2abuse-of-power.htm.

from irreparable harms caused by Defendants' failed handling of Anderson's sexual misconducts.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

A. Award damages in whatever amount the Plaintiff is found to be entitled;

B. Order compensation for all general, special, incidental, and consequential damages suffered by the Plaintiff as a result of the Defendants' conduct;

C. Award Plaintiff his reasonable attorney's fees, costs, and interest, to the fullest extent allowed by law; and

D. Any other relief the Court deems appropriate.


## **JURY DEMAND**

Now comes Plaintiff, by and through his attorneys, Elizabeth K. Abdnour and Karen Truszkowski, and demands a trial by jury.


DATED:      September 27, 2022          Respectfully Submitted,

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Suite 4A-2
Lansing, MI 48915
(517) 292-0067 phone

(517) 709-7700 fax
elizabeth@abdnour.com

*s/Karen Truszkowski*
Karen Truszkowski (P56929)
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
844-534-2560 phone
800-531-6527 fax
karen@temperancelegalgroup.com

*Attorneys for Plaintiff*